**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MATTHEW KALMAN,<br><br>Plaintiff,<br><br>vs.<br><br>AARON P. SEVIGNY; TENNILLE SEVIGNY; ACADIA WEALTH MANAGEMENT, LLC; TENARON, LLC; ESTATE OF LEO J. HERTZOG, JR., by its Personal Representative Jean E. Hertzog; LEO J. HERTZOG, JR. REVOCABLE TRUST OF 2003, by its Trustee Jean E. Hertzog; UNITED PLANNERS' FINANCIAL SERVICES OF AMERICA, L.P.; and ABC CORPORATIONS 1-10 (fictitious entities),<br><br>Defendants. | Civil Action No.: 1:26-cv-00619-CPO-SAK<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Matthew Kalman ("Plaintiff"), by and through his undersigned counsel, brings this action individually and on behalf of a class of similarly situated persons, and alleges the following against Defendants Aaron P. Sevigny; Tennille Sevigny; Acadia Wealth Management, LLC; Tenaron, LLC; the Estate of Leo J. Hertzog, Jr., by its Personal Representative Jean E. Hertzog; the Leo J. Hertzog, Jr. Revocable Trust of 2003, by its Trustee Jean E. Hertzog; United Planners' Financial Services of America, L.P.; and ABC Corporations 1-10 (collectively, "Defendants"), based upon personal knowledge as to himself and upon information and belief as to all other matters:

## SUMMARY OF THE ACTION

1. This is an action for federal securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and related state-law claims, brought on

behalf of Plaintiff and a class of similarly situated investors (the "Class") who entrusted their retirement savings and other funds to Defendants for investment advisory and brokerage services.

2. Defendants engaged in a systematic, multi-year scheme to solicit investments from retirees and conservative clients, recommending and selling unsuitable, high-risk, illiquid alternative investments — such as private placements in GPB Capital Holdings, LLC ("GPB"); syndicated conservation easements sponsored by EcoVest Capital, Inc. ("EcoVest"); shares in Priority Income Fund, Inc. ("Priority Income Fund"); and other speculative vehicles — driven by exorbitant commissions and undisclosed conflicts of interest, while prioritizing personal gain over fiduciary obligations.

3. Defendant Aaron P. Sevigny ("Sevigny"), a registered broker and investment advisor, along with his wife, Defendant Tennille Sevigny, and their controlled entities, including Defendant Acadia Wealth Management, LLC ("Acadia"), marketed themselves as trusted fiduciaries specializing in retirement planning. However, they routinely directed clients into speculative investments that were incompatible with conservative risk profiles, leading to catastrophic losses, tax liabilities, penalties, and illiquidity.

4. Defendant United Planners' Financial Services of America, L.P. ("United Planners"), Sevigny's supervising FINRA-member broker-dealer since 2006, failed to adequately supervise his activities despite numerous red flags, including industry warnings about high-risk alternative products, Sevigny's history of customer disputes, GPB's well-documented issues, EcoVest's abusive tax shelter allegations, Priority Income Fund's liquidity and valuation problems, and United Planners' own pattern of supervisory failures resulting in regulatory sanctions and multimillion-dollar restitutions. United Planners has a documented history of negligence, including a $40,000 FINRA fine and $37,125 restitution in 2022 for

failing to disclose GPB issues; a $100,000 Massachusetts fine in 2024 for supervising a representative in a $1 million real estate scam; a 2023 Arizona order for over $1 million in restitution and a $50,000 penalty for failing to supervise representative Philip Riposo's $4.5 million theft from clients; a $450,000 settlement for unsuitable leveraged investments by representative Cary Urich; and multiple complaints against representative Aaron Graham for unsuitability and fraud.

5. The late Leo J. Hertzog, Jr. ("Decedent"), father-in-law to Defendant Aaron P. Sevigny, actively induced clients, including Plaintiff, to retain Sevigny's services through personal recommendations and endorsements, knowingly or with reckless disregard for the substantial risks inherent in those investments, thereby advancing the interests of the family enterprise. Liability for the Decedent's conduct extends to the Estate of Leo J. Hertzog, Jr. (the "Estate"), and the Leo J. Hertzog, Jr. Revocable Trust of 2003 (the "Revocable Trust"), by and through Jean E. Hertzog in her capacities as nominated Personal Representative of the Estate and Trustee of the Revocable Trust, pursuant to Fla. Stat. §§ 733.612(20) (authorizing the personal representative to defend claims for the protection of the estate), 733.707(3) (rendering revocable trust assets liable for the estate's obligations to the extent probate assets are insufficient), and 736.05053 (imposing a trustee's duty to pay estate expenses and obligations upon request by the personal representative). Upon information and belief, assets from the Estate and Revocable Trust have poured over or been transferred into the Jean E. Hertzog Revocable Trust, rendering it liable as a successor-in-interest under applicable Florida law. The Estate is the subject of a pending probate proceeding in the Circuit Court of Collier County, Florida (Case No. 2026-CP-000014), wherein Plaintiff, as a creditor, has timely filed a Statement of Claim pursuant to Fla. Stat. § 733.703 for unliquidated damages exceeding $2,000,000. Additionally, pursuant to Fla. Stat. §§ 733.705(4) and 733.705(5), Plaintiff has

commenced an independent action in the Circuit Court of Collier County, Florida (Case No. 2026-CA-000500), to assert these claims following Defendant's objection to the Statement of Claim. The claims advanced herein constitute independent tort actions sounding in federal securities fraud, civil RICO violations, and cognate state-law wrongs, which are neither resolvable within the confines of the probate proceeding nor subject to the probate exception to federal jurisdiction, as delineated in *Marshall v. Marshall*, 547 U.S. 293 (2006).

6. Public records, including Sevigny's FINRA BrokerCheck report (CRD #4314368, last accessed March 7, 2026), disclose five customer disputes, comprising three settled matters from 2021 totaling approximately $177,100 and two pending disputes initiated in January 2026, each alleging substantial damages exceeding $1,000,000. These disputes uniformly involve claims of unsuitability in high-risk alternative investments — such as Priority Income Fund, Creative Media & Community Trust, GPB Capital Holdings, and syndicated conservation easements — along with fraud, breach of fiduciary duty, negligence, negligent supervision, breach of contract, failure to supervise, aiding and abetting fraud, violations of state securities laws, and related misconduct. Echoing these patterns, multiple investor protection law firms have publicly announced investigations into Sevigny's practices, citing similar grievances from retirees and conservative clients who allege catastrophic losses due to undisclosed risks and conflicts. These recurring allegations, which align with those asserted herein, indicate a pattern of misconduct that warrants thorough examination to determine the full scope of affected investors and the systemic deficiencies in these advisory practices.

7. Defendants provided inadequate or no accountings, ceased meaningful communication as losses mounted, and left investors with devalued, illiquid, or inaccessible assets. For example, GPB, which Sevigny recommended to multiple clients, was charged by

the SEC as a $1.6 billion Ponzi-like scheme; EcoVest conservation easements exposed investors to IRS audits, back taxes, interest, and penalties; and Priority Income Fund suffered partial redemptions of preferred stock (e.g., Series G in 2024, Series H in 2025), NAV declines, repurchase limitations, and suspended offerings. Recent developments include: for GPB, the August 2024 conviction and May 9, 2025 sentencing of former executives David Gentile (7 years, commuted November 2025) and Jeffry Schneider (6 years) for defrauding investors in a $1.6 billion scheme (U.S. DOJ, E.D.N.Y.), and an April 2025 receiver distribution of $400 million; for EcoVest, a 2023 DOJ settlement for $6 million, September and November 2025 Tax Court rulings disallowing deductions, and IRS announcements in January 2026 of final settlement offers for such cases; for Priority Income Fund, a May 2025 repurchase of only approximately 60% of tendered shares at a reduced NAV of $7.17, with ongoing suspensions of new offerings and redemptions of preferred stock in July 2025 and November 2024.

8. Plaintiff, a New Jersey resident and licensed attorney, was introduced by the Decedent to Sevigny for investment advisory services, prompting Plaintiff to entrust substantial retirement savings and other funds to Defendants on the premise of conservative, fiduciary-aligned management. These investments; however, were plainly unsuitable for Plaintiff's risk-averse profile and objectives, causing significant financial harm — well below reasonable market benchmarks — due to hidden fees, ongoing illiquidity from sponsor failures, deceptive statements about risks and regulatory issues, and unforeseen tax burdens, including denied deductions and penalties. These damages are recoverable from the Estate, the Revocable Trust, and, upon information and belief, the Jean E. Hertzog Revocable Trust as a pour-over or successor entity liable under Florida law for the Decedent's tortious conduct. This liability extension is consistent with the ongoing Florida probate proceedings (Collier County Case No. 2026-CP-000014) and independent action (Case No. 2026-CA-000500), where Plaintiff's

claims have been timely filed, and aligns with federal jurisdiction, as these *in personam* tort claims for securities fraud, RICO violations, and related wrongs fall outside the probate exception under *Marshall v. Marshall*, 547 U.S. 293 (2006).

9. This action seeks compensatory damages, rescission, treble damages under RICO and the New Jersey Consumer Fraud Act, punitive damages, disgorgement of ill-gotten gains, and other equitable relief to make Plaintiff and the Class whole.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, as they arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and under 18 U.S.C. § 1964(c) for RICO violations.

11. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy under Article III of the United States Constitution. To the extent any state-law claims are argued to be preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f), Plaintiff asserts them individually and not as part of the Class, as they arise from breaches of fiduciary duty and negligent supervision independent of any misrepresentation or omission in connection with the purchase or sale of a covered security.

12. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) for individual claims exceeding $75,000, and pursuant to 28 U.S.C. § 1332(d) under the Class Action Fairness Act of 2005 ("CAFA"), as: (i) the matter in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs; (ii) minimal diversity exists, with Plaintiff a citizen of New Jersey and Defendants citizens of Florida and Arizona; and (iii) the Class includes members from multiple states. The Class allegations, including claims against non-

signatories to any arbitration agreement and under RICO, further support jurisdiction, as such claims are not subject to FINRA arbitration under FINRA Rules 12200 and 12204.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 18 U.S.C. § 1965, as substantial acts and omissions giving rise to the claims occurred here, including solicitations and communications directed to New Jersey residents, investments executed on their behalf, and harm suffered in New Jersey. In particular, the Decedent personally met with and solicited Plaintiff in New Jersey, leveraging his longstanding ownership of multiple properties in Margate, New Jersey, over two decades, to induce Plaintiff and other New Jersey residents to engage Sevigny's services; these in-forum activities represent purposeful availment of New Jersey's markets and directly relate to the fraudulent scheme, as the Decedent's referrals originated from these connections, resulting in investments managed for New Jersey clients and losses incurred in the state. This Court also has personal jurisdiction over the Estate of Leo J. Hertzog, Jr., and the Leo J. Hertzog, Jr. Revocable Trust of 2003, by and through Jean E. Hertzog as Personal Representative and Trustee, consistent with the Due Process Clause, as the Decedent maintained substantial, continuous contacts with New Jersey, including ownership and use of multiple high-value residential properties in Margate for over two decades, where he personally met and solicited Plaintiff to invest with Sevigny; these contacts arise out of and relate to the claims, as they facilitated the referrals central to the scheme, directed at New Jersey residents, and caused foreseeable harm in the state, as recognized in *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312 (3d Cir. 2007). Moreover, nationwide service of process under the Exchange Act and RICO establishes jurisdiction, and exercising it here comports with traditional notions of fair play and substantial justice given the Estate's and Trust's significant assets (potentially including those poured over to the Jean E. Hertzog Revocable Trust) and the

forum's interest in protecting its residents from securities fraud. Defendants are registered to conduct securities business in New Jersey and purposefully availed themselves of this forum. All relevant transactions involved domestic purchases or sales of securities within the United States, satisfying the territorial requirements under *Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247 (2010).

## PARTIES

14. Plaintiff Matthew Kalman is an individual residing in Atlantic County, New Jersey, and is licensed to practice law in New Jersey and Pennsylvania.

15. Defendant Aaron P. Sevigny is an individual residing at 27633 Hickory Boulevard, Bonita Springs, Florida 34134. He is a registered broker and investment advisor with United Planners (CRD #4314368) since 2006, holding designations including Certified Estate Planner™ (CEP®), awarded July 1, 2005, by the National Institute of Certified Estate Planners, which requires adherence to a professional code of ethics. Sevigny is the principal and control person of Acadia and controls Tenaron, LLC.

16. Defendant Tennille Sevigny is an individual residing at 27633 Hickory Boulevard, Bonita Springs, Florida 34134. She is an officer and control person of Acadia, participated in client communications and operations, and aided the scheme, though not a FINRA-registered person.

17. Defendant Acadia Wealth Management, LLC is a Florida limited liability company with its principal place of business at 3511 Bonita Bay Blvd., Suite 2, Bonita Springs, Florida 34134. Acadia operates as an investment advisory firm and is controlled by the Sevignys. Upon information and belief, Acadia is affiliated with or related to other entities, including the Acadia Foundation (a Florida non-profit entity, Document No. N07000007065, with potential ties to the Sevignys), which may have been used in connection with the scheme.

18. Defendant Tenaron, LLC is a Florida limited liability company controlled by Sevigny, with its principal place of business in Bonita Springs, Florida. It is used to hold real estate and other assets potentially traceable to proceeds from the fraudulent scheme, and is not a FINRA member or associated person.

19. The Estate of Leo J. Hertzog, Jr., by its Personal Representative Jean E. Hertzog, and the Leo J. Hertzog, Jr. Revocable Trust of 2003, by its Trustee Jean E. Hertzog, are named as defendants. Jean E. Hertzog resides at 350 Sedgwick Court, Naples, Florida 34108. The Decedent actively participated in the scheme by personally soliciting and referring clients, including Plaintiff, to Sevigny during in-person meetings in New Jersey at the Hertzogs' properties in Margate, knowing or recklessly disregarding the unsuitable nature of the investments and Sevigny's commission-driven practices, which benefited the family enterprise through shared profits and relationships. The Decedent's history of involvement in disputed investment schemes, as evidenced by his role as a plaintiff in the 2008 multidistrict litigation *In re ClassicStar Mare Lease Litigation*, MDL No. 1877 (E.D. Ky.), where he alleged fraud in a similar high-risk program, further underscores his familiarity with such risks. The Estate and Trust are liable for the acts of the Decedent pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, which extend creditor claims to revocable trust assets if the probate estate is insufficient. Upon information and belief, assets from the Estate and Trust have poured over into the Jean E. Hertzog Revocable Trust, making it a potential source of recovery as a successor-in-interest, subject to further discovery and potential joinder if necessary.

20. Defendant United Planners' Financial Services of America, a Limited Partnership, is an Arizona limited partnership and FINRA-member broker-dealer (CRD #20804) with its principal place of business at 7333 E. Doubletree Ranch Road, Suite 120, Scottsdale, Arizona 85258. United Planners supervised Sevigny but had no direct customer

agreement with Plaintiff. United Planners has a documented history of supervisory failures, including multiple regulatory sanctions for negligence in overseeing representatives involved in fraudulent schemes, such as its 2016 FINRA sanction for failing to detect issues in private placements (AWC No. 2015044960501), which directly relates to the types of investments at issue here.

21. Defendants ABC Corporations 1-10 are fictitious entities whose true identities are unknown but who participated in or aided the scheme, potentially including affiliates like EcoVest Capital, Inc., GPB Capital Holdings, LLC, or Priority Income Fund, Inc.

## STATEMENT OF FACTS

### A. Defendants' Business and Representations

22. Sevigny founded Acadia around 2003 as a family business with Tennille Sevigny, marketing it as specializing in retirement and estate planning for retirees, physicians, executives, and business owners (Naples Daily News, March 17, 2009).

23. Sevigny held himself out as a fiduciary with elite credentials, including CEP®, requiring compliance with a code of ethics emphasizing client interests (NICEP profile, accessed March 9, 2026).

24. Acadia's website and materials confirmed registration in New Jersey for securities and advisory services, with Sevigny licensed there since at least 2008.

25. United Planners has supervised Sevigny's brokerage activities since 2006, including oversight of alternative investment sales. However, United Planners has a pattern of supervisory deficiencies, evidenced by regulatory actions: In 2016, FINRA sanctioned United Planners for failing to detect issues in private placements (AWC No. 2015044960501); in 2022, FINRA fined United Planners $40,000 and ordered $37,125 restitution for failing to disclose GPB issues to investors; in 2023, Arizona ordered over $1 million in restitution and a

$50,000 penalty for failing to supervise representative Philip Riposo's $4.5 million theft from clients; in 2024, Massachusetts fined United Planners $100,000 for supervision failures in a $1 million+ real estate fraud scheme involving Riposo; and additional settlements, including $450,000 for unsuitable leveraged investments by representative Cary Urich and complaints against Aaron Graham for unsuitability and fraud. United Planners received specific notifications about GPB's non-filing of financial statements in 2018 and 2019 but failed to inform or restrict Sevigny's sales.

26. The Decedent, as Sevigny's father-in-law, actively endorsed and referred clients to Sevigny, leveraging longstanding personal relationships to induce retention of his services, notwithstanding knowledge or reckless disregard of Sevigny's propensity for unsuitable recommendations and United Planners' supervisory deficiencies. For example, the Decedent personally introduced and recommended Sevigny to Plaintiff during in-person meetings at the Hertzogs' summer residences in Margate, New Jersey, around 2013-2015, portraying Sevigny as a trusted family advisor specializing in conservative retirement planning, while failing to disclose material risks tied to high-commission alternative investments — risks that the Decedent, as a sophisticated investor with intimate family connections to the enterprise, was positioned to recognize or inquire into, particularly in light of his prior experience with disputed high-risk schemes as documented in *In re ClassicStar Mare Lease Litigation*, MDL No. 1877 (E.D. Ky. 2008). Liability for these actions attaches to the Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, with potential reach to the Jean E. Hertzog Revocable Trust as a pour-over beneficiary or successor entity accountable for the Decedent's torts.

**B. The Fraudulent Scheme**

27. In or around 2015, the Decedent personally induced Plaintiff to retain Sevigny and Acadia for investment advisory services, with brokerage facilitated through United Planners, via targeted solicitations during in-person interactions at the Hertzogs' properties in New Jersey. Plaintiff, pursuing prudent and conservative stewardship of his retirement savings, accordingly entrusted substantial funds to Defendants. Liability for the Decedent's inducement — undertaken with knowledge or reckless disregard of the attendant risks in light of his familial ties and prior exposure to high-stakes investment disputes — extends to the Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, with potential accountability reaching the Jean E. Hertzog Revocable Trust as a pour-over or successor entity.

28. Initial communications were regular, including quarterly calls and emails (e.g., October 2018 email chain with Claudia Sheppard scheduling reviews involving Sevigny and Tennille Sevigny), but essential details like comprehensive statements or investment specifics were withheld.

29. Sevigny recommended and placed Plaintiff and Class members in unsuitable alternative investments, including:

a. Private placements in GPB, which the SEC charged as a $1.6 billion Ponzi-like scheme in *SEC v. GPB Capital Holdings, LLC*, No. 21-cv-00583-MKB-VMS (E.D.N.Y. filed Feb. 4, 2021). GPB raised funds from approximately 17,000 investors, promising high returns from automotive and waste management holdings, but instead siphoned new investor money to pay distributions and concealed losses. United Planners negligently failed to inform investors of GPB's issues, including non-filing of financial statements, despite receiving notifications in 2018 and 2019, and approved Sevigny's sales through internal reviews on or about June 2018 and March 2019. Specific misstatements include Sevigny's representations in client meetings and

documents (e.g., around 2017-2019) that GPB was a stable, income-generating investment with low risk, omitting known issues like delayed audits and SEC probes, which were material as they would have altered the total mix of information for a reasonable investor, leading to devaluations upon corrective disclosures such as the 2021 SEC charges and 2024 convictions, proximately causing over 70% drops in unit values and investor losses.

b. Syndicated conservation easements sponsored by EcoVest, which were abusive tax shelters. Sevigny received commissions or compensation for these sales. Investors, including Class members, remain liable for federal taxes reduced or eliminated via deductions, plus accrued interest and penalties, per the U.S. Department of Justice. When adding purchase costs, losses are substantial. Specific omissions include failure to disclose in promotional materials and client discussions (e.g., 2018-2020) the IRS's identification of these as "abusive transactions" and risks of audits/penalties, despite DOJ scrutiny beginning in 2017; these omissions were material, rendering affirmative statements about tax benefits misleading. United Planners ignored IRS notices in its 2019 compliance audits, leading to devaluations upon corrective disclosures such as 2025 Tax Court rulings and January 2026 IRS settlements, proximately causing disallowed deductions, penalties, and substantial tax liabilities.

c. Shares in Priority Income Fund, a closed-end CLO-focused vehicle with NAV declines from ~$15 to ~$7.17 by April 2025, limited repurchases (failing to meet demand, e.g., only 60% of tendered shares repurchased in May 2025), suspended offerings, and illiquidity risks unsuitable for conservative profiles. The fund's complex structure, including equity/junior tranches, posed undisclosed risks. Specific misrepresentations include Sevigny's claims in advisory reports (e.g., 2019-2021) that the fund offered consistent income with minimal volatility, omitting repurchase limitations and NAV decline risks, which were material to investment decisions. United Planners received valuation alerts in 2020 but did not restrict sales, leading to devaluations upon corrective disclosures such as May 2025 partial repurchases and ongoing suspensions, proximately causing NAV erosion, illiquidity, and investor losses.

30. Recent developments in the GPB matter underscore the fraud: In August 2024, a federal jury convicted David Gentile and Jeffry Schneider; in May 2025, they were sentenced to prison (U.S. DOJ); in April 2025, the SEC issued further litigation releases; and in January 2025, the receiver filed a distribution plan with the EDNY Court. For EcoVest, Tax Court

rulings in September and November 2025 disallowed deductions in syndicated easement cases, and the IRS announced final settlement offers in January 2026. These disclosures caused direct devaluations, e.g., GPB units dropped over 70% post-2024 conviction, proximately causing Class losses.

31. Vernon Litigation Group has filed multiple FINRA arbitration claims against Sevigny for selling GPB to retirees, alleging unsuitability, failure to supervise, and undisclosed conflicts (January 12, 2022 press release; ongoing similar claims).

32. Sevigny failed to provide accountings or disclose risks, such as GPB's failure to file audited financials, SEC investigations, commission-driven incentives (up to 8-12% on alternatives), EcoVest's tax shelter abuses, or Priority Income Fund's liquidity and valuation issues. Sevigny personally owned some recommended products, creating undisclosed conflicts. These omissions were necessary to make affirmative statements not misleading and arose from a duty to disclose as fiduciaries. United Planners, aware via its 2018-2021 internal reports, recklessly failed to intervene.

33. Communication with Plaintiff ceased in November 2024, amid mounting losses, concealing the full extent of the fraud until recent public revelations.

34. Sevigny's BrokerCheck report (as of 2026) shows three settled customer disputes totaling $177,100, all involving alternative investments with allegations mirroring those here: unsuitability, fraud, breach of fiduciary duty, negligence, and failure to supervise (Docket #21-01802, settled January 25, 2022 for $102,600; Docket #21-01047, settled September 7, 2022 for $49,500; Docket #21-00216, settled October 13, 2022 for $25,000). United Planners was notified of these in 2021 but took no corrective action, further evidencing its pattern of supervisory negligence.

35. United Planners neglected supervision despite red flags, including FINRA notices on alternative investments (e.g., NTM 03-49), Sevigny's high complaint ranking (top 0.41%), GPB's Ponzi allegations (known by 2019), EcoVest's DOJ scrutiny (2017 onward), Priority Income Fund's declines (2020 alerts), and its own history of failures (e.g., Philip Riposo's theft, Cary Urich's ETF disputes, Aaron Graham's complaint, Massachusetts real estate fraud fine). This recklessness, an extreme departure from care, evidences scienter.

36. Tennille Sevigny aided the scheme through client interactions, operations, and family ties, including specific acts such as participating in misleading 2018 communications downplaying GPB delays and facilitating nondisclosures of risks in advisory reports from 2019-2021. The Decedent's referrals were reckless given his knowledge of the investments, as evidenced by his substantial involvement — including direct solicitations in New Jersey around 2013-2015 and awareness of the family business's practices through close familial and financial ties, potentially benefiting the Estate from scheme proceeds — which constituted at least reckless indifference, an extreme departure from ordinary care. These facts support a strong inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent, as required by the PSLRA and interpreted in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), and Third Circuit precedent such as *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009).

37. Assets held by Tenaron, LLC (e.g., real estate) and potentially the Acadia Foundation may be traceable to fraud proceeds, warranting disgorgement.

38. Plaintiff has suffered losses approximating $2,000,000, including principal erosion, opportunity costs, fees, tax liabilities, and penalties, with similar harms to the Class, ascertainable via investment records and expert analysis.

## CLASS ALLEGATIONS

39. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class defined as: All persons who invested funds with or through Defendants in unsuitable alternative investments, including but not limited to GPB products, EcoVest conservation easements, Priority Income Fund shares, or similar vehicles, during the Class Period (January 1, 2013, to the present), excluding Defendants, their immediate family members, and any entity in which Defendants have a controlling interest.

40. Numerosity (Fed. R. Civ. P. 23(a)(1)): The Class is so numerous that joinder of all members is impracticable. Upon information and belief, based on GPB's scale (raising $1.6 billion from approximately 17,000 investors nationwide), EcoVest's syndicated easements (affecting numerous investors liable for taxes and penalties per DOJ), Priority Income Fund's $900 million+ assets with widespread suitability complaints, Sevigny's multiple settled customer disputes involving similar products, reports of additional claims against him (e.g., Vernon Litigation Group handling multiple GPB-related claims), and United Planners' history of supervisory failures impacting clients in cases like Philip Riposo ($4.5 million theft), Cary Urich ($325,000 settlement), and Aaron Graham, the Class includes at least hundreds, if not thousands, of members dispersed geographically throughout the United States.

41. Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), (b)(3)): Common questions of law and fact exist and predominate over individual issues, including: (a) whether Defendants misrepresented the suitability, risks, and performance of recommended investments like GPB, EcoVest, and Priority Income Fund; (b) whether Defendants omitted material facts about commissions, conflicts, tax liabilities, illiquidity, and red flags; (c) whether Sevigny and Acadia breached fiduciary duties; (d) whether United Planners failed to supervise in violation

of FINRA Rule 3110; (e) whether the scheme constituted a RICO enterprise and pattern of racketeering; (f) whether the Decedent's referrals were negligent or fraudulent; and (g) the appropriate measure of damages, including tax penalties and interest. Reliance issues are common, as omissions trigger the *Affiliated Ute* presumption, and uniform misrepresentations support class-wide proof; individual suitability assessments do not predominate given systemic supervision failures, as recognized in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

42. Typicality (Fed. R. Civ. P. 23(a)(3)): Plaintiff's claims are typical of the Class, arising from the same course of conduct: unsuitable recommendations of high-risk alternatives, non-disclosures, supervisory failures, and abandonment leading to losses, tax exposures, and illiquidity.

43. Adequacy (Fed. R. Civ. P. 23(a)(4)): Plaintiff has no conflicts of interest with the members of the proposed Class and is committed to diligently and vigorously prosecuting this action on their behalf. As a licensed attorney directly harmed by the alleged misconduct, Plaintiff brings both a substantial personal stake in the outcome and the legal acumen necessary to oversee the litigation effectively. To ensure optimal representation in this complex securities fraud and RICO class action, Plaintiff will, as appropriate, associate with counsel possessing extensive experience in federal securities, RICO, and class action litigation.

44. Superiority (Fed. R. Civ. P. 23(b)(3)): A class action is superior for efficient adjudication, avoiding inconsistent rulings and conserving resources, especially given the modest individual claims relative to litigation costs and the common proof of systemic failures.

45. Injunctive Relief (Fed. R. Civ. P. 23(b)(2)): Defendants' uniform conduct makes final injunctive relief appropriate for the Class as a whole.

## CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Sevigny, Tennille Sevigny, Acadia, and United Planners)**

46. Plaintiff incorporates by reference the preceding paragraphs.

47. Defendants, in connection with the purchase and sale of securities (as defined in 15 U.S.C. § 78c(a)(10), including notes, evidence of indebtedness, and investment contracts in GPB, EcoVest, and Priority Income Fund), used manipulative and deceptive devices, including material misrepresentations and omissions about the suitability, risks, liquidity, performance, tax implications, and conflicts of investments like GPB, EcoVest, and Priority Income Fund, which were touted as stable despite known red flags (e.g., unaudited financials, SEC probes, DOJ tax liabilities, NAV declines, repurchase limitations, Ponzi allegations). These misrepresentations and omissions were made through various means, including client communications, promotional materials, and failure to provide accurate account statements, all in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Specific examples include: (i) Sevigny's oral and written statements in 2017-2019 client meetings and reports describing GPB as "low-risk" with guaranteed 8% returns, false given undisclosed Ponzi elements, with United Planners approving via emails dated June 15, 2018; (ii) omissions in EcoVest materials (2018-2020) of IRS "Dirty Dozen" listing and audit risks, necessary to make tax benefit claims not misleading, ignored in United Planners' March 2019 review; (iii) representations in Priority Income Fund advisories (2019-2021) of "reliable income without volatility," omitting known NAV drops and repurchase caps, with United Planners receiving alerts on February 10, 2020. These statements were material, as a reasonable investor would consider them important, significantly altering the total mix of information.

48. Defendants acted with scienter, as evidenced by high commissions (up to 8-12% on alternatives, providing motive and opportunity), prior disputes (three settled complaints mirroring these allegations, notified to United Planners in 2021), failure to disclose conflicts (including Sevigny's personal holdings), and United Planners' pattern of supervisory negligence, which constituted at least reckless indifference to the truth — an extreme departure from ordinary care. For instance, Sevigny knowingly or recklessly ignored GPB's SEC investigations and EcoVest's DOJ scrutiny (public by 2018-2019), while United Planners disregarded FINRA warnings and its own internal red flags (e.g., 2022 GPB fine, 2018 GPB notifications), allowing the scheme to persist despite knowledge of risks as early as 2016. These facts give rise to a strong inference of scienter, cogent and at least as compelling as any opposing inference of nonfraudulent intent, as required by the PSLRA and interpreted in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), and Third Circuit precedent such as *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009).

49. Plaintiff and the Class reasonably relied on Defendants' fiduciary representations and suffered economic losses proximately caused by the misconduct, as revelations of GPB's fraud (e.g., 2021 SEC charges, 2024 convictions, 2025 sentencings and receiver plan), EcoVest's tax abuses (e.g., 2025 Tax Court rulings, January 2026 IRS settlements), and Priority Income Fund's declines (e.g., May 2025 partial repurchases at reduced NAV) directly devalued investments and triggered liabilities. This reliance was justifiable given Defendants' positions of trust and superior knowledge, and presumable under *Affiliated Ute* for omissions breaching disclosure duties. The losses include diminished principal, lost opportunities, fees, taxes, interest, and penalties, with causation shown by market reactions and corrective disclosures negatively impacting values (e.g., GPB unit values fell 70% post-May 2025 sentencing).

50. This claim is timely under 28 U.S.C. § 1658(b) (two years from discovery, five years from violation), as Plaintiff discovered the facts constituting the violation only in November 2024 when communications ceased, revealing concealment, and through recent public developments in 2025-2026; prior “red flags” were actively concealed by Defendants’ ongoing assurances and nondisclosures, tolling the limitations period under the discovery rule and fraudulent concealment doctrine.

**COUNT II**

**Section 20(a) Controlling Person Liability Under the Exchange Act**
**(Against Sevigny, Tennille Sevigny, Acadia, Hertzog Estate, and United Planners)**

51. Plaintiff incorporates by reference the preceding paragraphs.

52. Defendants exercised control over the primary violators and culpably participated in the underlying Exchange Act violations, rendering them jointly and severally liable under Section 20(a) (15 U.S.C. § 78t(a)): Sevigny, as principal and managing member of Acadia and Tenaron, directed their advisory and operational activities, including the unsuitable recommendations and fraudulent concealments at the scheme’s core; Tennille Sevigny managed day-to-day operations, facilitated client interactions, and aided in the dissemination of misleading information; United Planners, as Sevigny’s supervising broker-dealer under FINRA rules, possessed authority to enforce compliance but recklessly disregarded red flags, such as 2018-2021 regulatory notifications about GPB’s delays, EcoVest’s IRS scrutiny, and its own prior sanctions (e.g., $40,000 FINRA fine in 2022 for supervisory lapses), thereby enabling the misconduct through willful blindness or gross negligence. The Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, assumed control and culpable participation via the Decedent’s integral role in client referrals and inducements — leveraging family ties to funnel investors into the enterprise with knowledge or

reckless disregard of the violations, as evidenced by his prior entanglement in analogous high-risk schemes per *In re ClassicStar Mare Lease Litigation*, MDL No. 1877 (E.D. Ky. 2008) — imputable under Florida law (Fla. Stat. §§ 733.612(20), 733.707(3), 736.05053), with potential extension to the Jean E. Hertzog Revocable Trust as pour-over successor.

53. This claim is timely as above.

**COUNT III**

**Violation of RICO, 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

54. Plaintiff incorporates by reference the preceding paragraphs.

55. Defendants conducted the affairs of a RICO enterprise — an association-in-fact comprising Acadia, Tenaron, United Planners, the Sevignys, the Estate, the Revocable Trust (by and through Jean E. Hertzog as nominated Personal Representative and Trustee), and affiliated entities (including the Acadia Foundation Inc., a Florida non-profit where Sevigny has served as CEO since 2007, potentially used to facilitate scheme-related activities or asset management; and, upon information and belief, the Jean E. Hertzog Revocable Trust as a potential pour-over successor) — united by the shared objective of defrauding conservative investors through the unsuitable promotion and sale of high-risk products like GPB, EcoVest, Priority Income Fund, and analogous alternatives since at least 2006. This enterprise operated as a cohesive, enduring unit with a discernible hierarchy: Sevigny and Acadia at the forefront, orchestrating direct solicitations and unsuitable allocations (e.g., 2017-2019 placements); Tennille Sevigny providing operational support through client communications and administrative concealment (e.g., misleading 2018 emails downplaying GPB delays); United Planners exercising supervisory oversight yet recklessly approving transactions despite glaring warnings (e.g., 2018-2021 reviews ignoring FINRA alerts on alternative investments); and the

Decedent (imputable to the Estate and Trust) serving as the referral conduit, leveraging familial bonds and New Jersey connections to draw in clients (e.g., 2015 introduction to Plaintiff), thereby fueling the scheme's client acquisition with knowledge or reckless indifference to its fraudulent underpinnings.

56. The pattern of racketeering included multiple acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343) over years, such as misleading emails and calls (e.g., October 2018 email from Sevigny omitting GPB risks; March 2019 wire from United Planners approving EcoVest despite IRS notices; February 2020 advisory report omitting Priority declines), omitting risks, commissions, tax liabilities, and inflating returns, affecting interstate commerce. These acts were related by purpose (enriching Defendants at investors' expense), participants, victims (retirees with conservative profiles), and methods (unsuitable recommendations driven by commissions), and demonstrated continuity through repeated conduct spanning at least a decade, with closed-ended pattern (2013-2026 investments) and open-ended threat (ongoing supervision failures).

57. The pattern was both closed-ended (ongoing since at least 2013 with multiple victims) and open-ended (threat of continuation absent intervention, as evidenced by United Planners' recurring sanctions).

58. Plaintiff and the Class suffered injury to business or property, including losses approximating $2,000,000 per Plaintiff (plus taxes, penalties, interest), proximately caused by the violations, as the predicates directly led to unsuitable investments, devaluation, illiquidity, and liabilities, foreseeable from the fraud.

59. This claim is timely (four years from discovery), as facts were concealed until November 2024 cessation and 2025-2026 developments, tolling the period.

**COUNT IV**

**RICO Conspiracy, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

60. Plaintiff incorporates by reference the preceding paragraphs.

61. Defendants conspired to violate § 1962(c), agreeing to the fraudulent objective through coordinated solicitations, family ties, shared profits, and supervisory lapses, with overt acts including misleading communications (e.g., 2018-2021 emails/wires), non-disclosures, and sales of unsuitable products. The agreement is evidenced by the enterprise's structure, repeated conduct, and mutual benefits, such as commissions to Sevigny and referrals from the Decedent. The Decedent's involvement, as detailed in Paragraphs 5, 19, 26, 27, and 36, further supports the conspiracy through his New Jersey-based solicitations and reckless endorsements.

62. Injury and timeliness as in Count III.

**COUNT V**

**New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.***
**(Against All Defendants)**

63. Plaintiff incorporates by reference the preceding paragraphs.

64. Defendants engaged in unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale, advertisement, or subsequent performance of services and the marketing and sale of securities in violation of N.J.S.A. 56:8-2. These unconscionable practices included affirmative misrepresentations (e.g., that the Alternative Investments were suitable, low-risk, stable, and appropriate for conservative retirement portfolios) and material omissions (e.g., commissions, conflicts, tax risks, illiquidity, Ponzi allegations, regulatory red flags, and prior customer disputes) in the solicitation, recommendation, and sale of the

investments, as well as in the ongoing performance of advisory services. To the extent argued preempted by SLUSA, this claim is asserted individually, based on independent breaches of duty and non-covered claims involving fiduciary breaches independent of misrepresentations in covered securities sales.

65. The misrepresentations and omissions were perpetrated in the course of Defendants' commercial endeavors, encompassing the sale of investment advisory services and securities to consumers like Plaintiff and the Class — qualifying as "consumers" under the expansive purview of the New Jersey Consumer Fraud Act ("NJCFA"), as elucidated by the New Jersey Supreme Court in *Lemelledo v. Beneficial Mgmt. Corp.*, 150 N.J. 255 (1997) (affirming the NJCFA's broad application to deceptive practices in service sales) and *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994) (extending coverage to fraud in contract performance). The Third Circuit has likewise affirmed the NJCFA's reach to fraudulent conduct in consumer contract execution, including deceptive inducements to execute agreements, transcending mere initial transactions. *See*, *Alpizar-Fallas v. Favero*, 908 F.3d 910 (3d Cir. 2018) (upholding NJCFA applicability to an insurer's fraudulent inducement in settling claims). The Decedent's referrals, as chronicled in Paragraphs 5, 19, 26, 27, and 36, exemplified unconscionable commercial practices by fostering reliance on specious endorsements integral to the scheme, proffered with knowledge or reckless disregard of their misleading nature. Liability for such inducements adheres to the Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, with prospective extension to the Jean E. Hertzog Revocable Trust as pour-over successor.

66. Plaintiff and the Class suffered ascertainable losses approximating $2,000,000 per Plaintiff (and in the aggregate exceeding $5,000,000), causally linked to the misconduct, as the unconscionable practices directly induced unsuitable investments, resulting in principal

erosion, excessive fees, tax liabilities, penalties, interest, and opportunity costs far below prudent benchmarks. These losses are ascertainable through objective evidence, including investment records, market comparisons, and expert analysis.

67. This claim is timely (six years), as discovery occurred in 2024-2026, tolled by fraudulent concealment. Remedies include treble damages, attorneys' fees, and costs (N.J.S.A. 56:8-19).

**COUNT VI**

**Common-Law Fraud**
**(Against All Defendants)**

68. Plaintiff incorporates by reference the preceding paragraphs.

69. Defendants made material misrepresentations and omissions about the investments' suitability, risks, and viability, with scienter — actual knowledge of their falsity or reckless disregard for the truth — and with the intent to induce reliance by Plaintiff and the Class. For example, Sevigny presented GPB, EcoVest, and Priority Income Fund as safe, low-risk choices for conservative investors, while deliberately omitting key dangers such as GPB's Ponzi-like features (e.g., using new investor money to fund distributions while hiding operational breakdowns), EcoVest's IRS challenges as abusive tax shelters (leading to denied deductions and penalties), and Priority Income Fund's overstated values and redemption restrictions. United Planners enabled these deceptions through major supervisory failures, ignoring obvious red flags like 2018-2021 FINRA warnings and its own record of regulatory penalties. The Decedent (imputable to the Estate and Trust) contributed to the fraud through his New Jersey-based solicitations and careless endorsements, as detailed in Paragraphs 5, 19, 26, 27, and 36, given with knowledge or deliberate ignorance of the scheme's risks, consistent with his prior involvement in similar high-risk disputes in *In re ClassicStar Mare Lease*

*Litigation*, MDL No. 1877 (E.D. Ky. 2008). Liability for the Decedent's fraudulent inducements extends to the Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, with potential extension to the Jean E. Hertzog Revocable Trust as pour-over successor.

70. Plaintiff and the Class reasonably relied on these representations in making their investment decisions, suffering damages approximating $2,000,000 per Plaintiff as a direct and proximate result. This claim is timely under N.J.S.A. 2A:14-1 (six years), as tolled by the discovery rule until 2024-2026 revelations.

## COUNT VII

### Breach of Fiduciary Duty
### (Against Sevigny, Tennille Sevigny, Acadia, and United Planners)

71. Plaintiff incorporates by reference the preceding paragraphs.

72. As fiduciaries, Defendants owed duties of loyalty, care, and full disclosure, breached by unsuitable recommendations (violating FINRA Rule 2111), non-disclosures of risks/taxes/conflicts, supervisory failures (e.g., ignoring 2018-2021 red flags), and client abandonment. Sevigny and Acadia prioritized commissions over client interests; Tennille Sevigny facilitated operations; United Planners ignored red flags despite regulatory obligations under FINRA Rule 3110.

73. These breaches proximately caused the damages described above. This claim is timely under New Jersey law, with a six-year statute of limitations for negligence-based breaches or four years for intentional breaches, as tolled by the discovery rule.

## COUNT VIII

### Negligence and Negligent Supervision
### (Against All Defendants)

74. Plaintiff incorporates by reference the preceding paragraphs.

75. Defendants owed fiduciary duties stemming from their roles as investment advisors and brokers, as well as obligations under FINRA rules (e.g., Rule 3110 requiring reasonable supervision), which they breached through unsuitable recommendations, glaring supervisory oversights (e.g., disregarding 2018-2021 red flags on GPB's delays, EcoVest's tax disputes, and Priority Income Fund's liquidity woes), and a demonstrated pattern of negligence reflected in United Planners' regulatory sanctions and Sevigny's BrokerCheck disclosures. These breaches deviated substantially from the prevailing standard of care, as prudent professionals would have fully disclosed risks, vetted alternatives, and enforced suitability protocols; the economic loss doctrine poses no bar where, as here, independent tort duties predominate over contractual ones. The Decedent's negligent referrals — extended with reckless disregard during New Jersey-based interactions, as outlined in Paragraphs 5, 19, 26, 27, and 36 — form actionable negligence, proximately causing harm. Liability for the Decedent's inducements extends to the Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, with potential reach to the Jean E. Hertzog Revocable Trust as pour-over successor.

76. These breaches proximately caused the damages described above. This claim is timely under N.J.S.A. 2A:14-2 (two years), as tolled by the discovery rule.

## COUNT IX

**Aiding and Abetting Fraud and Breach of Fiduciary Duty**
**(Against All Defendants)**

77. Plaintiff incorporates by reference the preceding paragraphs.

78. Defendants possessed actual knowledge of the primary violations and rendered substantial assistance thereto through endorsements, operational facilitation, client referrals, supervisory derelictions, and deliberate concealments. For instance, Tennille Sevigny, aware of Sevigny's commission-motivated practices, assisted in client management and obfuscation of risks (e.g., via 2018 communications minimizing GPB issues); United Planners, cognizant of perils through repeated alerts (e.g., 2018-2021 FINRA notifications on alternative products), neglected to intervene despite its authority and history of censure; while the Decedent (imputable to the Estate and Trust) substantially aided the scheme via his solicitations and endorsements, as delineated in Paragraphs 5, 19, 26, 27, and 36, proffered with reckless indifference to the fraud's ramifications. Liability for the Decedent's aiding and abetting extends to the Estate and Revocable Trust, by and through Jean E. Hertzog as nominated Personal Representative and Trustee, pursuant to Fla. Stat. §§ 733.612(20), 733.707(3), and 736.05053, with potential extension to the Jean E. Hertzog Revocable Trust as pour-over successor.

79. These acts of aiding and abetting proximately caused the damages described above. This claim is timely under New Jersey law, with the same limitations period as the underlying wrongs, as tolled by the discovery rule.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment:

A. Certifying the Class and appointing Plaintiff and counsel as representatives;

B. Awarding compensatory and rescissory damages approximating $2,000,000 individually and exceeding $5,000,000 in the aggregate;

C. Awarding treble damages under RICO and the NJCFA;

D. Awarding punitive damages;

E. Ordering disgorgement and constructive trust over ill-gotten gains;

F. Awarding pre- and post-judgment interest, costs, and attorneys' fees;

G. Granting declaratory relief, including declarations that Defendants' conduct violated the Exchange Act, RICO, NJCFA, and common law, and affirming Plaintiff's and the Class's rights thereunder;

H. Granting equitable and injunctive relief as necessary to prevent further harm;

I. Granting such other relief as the Court deems just.

Dated: March 9, 2026

KALMAN LAW, P.C.
*Attorneys for Plaintiff*

*s/ Matthew Kalman*

MATTHEW KALMAN, ESQ.
1201 New Road, Suite 242
Linwood, New Jersey 08221
Tel: (609) 927-3100
Fax: (609) 601-4072
Email: mkalman@kalman-law.com

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1) and 38(c), Plaintiff hereby demands a trial by jury as to all issues so triable as a matter of right.

Dated: March 9, 2026

KALMAN LAW, P.C.
*Attorneys for Plaintiff*

*s/ Matthew Kalman*
MATTHEW KALMAN, ESQ.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I certify that this matter is not the subject of any other pending action, arbitration, or administrative proceeding, except the related probate proceeding (Case No. 2026-CP-000014) and independent action pursuant to Fla. Stat. § 733.705(5) (Case No. 2026-CA-000500) in the Circuit Court of Collier County, Florida.

Dated: March 9, 2026

KALMAN LAW, P.C.
*Attorneys for Plaintiff*

*s/ Matthew Kalman*
MATTHEW KALMAN, ESQ.